Sorry, I'll call the next case. It is the case of Allison Colardo-Keen, individually and as next friend and administrator of the estate of Thomas Colardo against Rockdale County and others. Good morning. I'm proud to have Mr. Colardo's daughter here with me today. Basically, this case starts earlier, but on March 15, 2012, from 924 a.m. to 534 p.m., a reasonable jury can conclude that defendants Whidbey and Fleming were deliberately indifferent to Mr. Colardo's serious medical needs. They admit on page 31 of their brief that they had to do one essential test. This is a de novo review and every inference is supposed to be decided in our favor. The district court said that there was a dispute of fact with regard to the timeline and then decided the fact based on a cover-up medical record that said that Mr. Colardo never told anybody until 510 p.m. that he had ITP. What the evidence does reveal in this case, based on Ms. Whidbey's testimony, that the reason she ordered a blood work stat was because she learned at the time that Mr. Colardo had a history of thrombocytopenia, which is a blood disorder of low platelets. She also had evidence her sole source of information that day was Nurse Fleming, District Court, LPN Fleming. District Court concluded that LPN Fleming had no notion that Mr. Colardo had ITP that day. That's clearly belied by the facts in this case. There was a phone call at 955 a.m. and there was a phone call at 312 p.m. In it, so, and there's First, the question is, and this timeline is very confusing, and it's no fault of yours, it's not your witnesses, but it's very confusing, and Nurse Whidbey seems to be all over the place. Well, but And so what I'm, I think if we, basic fact, basic premise, I think you agree that the pivotal event here is when they learned he had this autoimmune disease, that they did everything fine if they didn't know. And so when are the possible times they could have learned? Well, even Your argument is it was, your argument is it was 923 in the morning that he 955 No, 955 was the telephone call, wasn't it? Yes, she learned earlier, correct. That Nurse, that Nurse Fleming, and that she told Nurse Whidbey at 955 Correct. And at that point, your argument necessarily is either Nurse Whidbey said, do the blood work, get, you know, get that test done, or if she didn't say that, Nurse Whidbey is responsible because she didn't tell her to do those things. And if she did tell Nurse Fleming to do those things, Nurse Fleming is responsible because she didn't do those things. Is that your argument? Not exactly. Well, my argument is that they're both responsible. My argument is But you'd at least accept that part. You'd like to have one defendant sitting at a table at a trial, correct? No, one's better than none. All right. But what you got is, you've got two phone calls. You got a 955 phone call, and you got a 312 phone call. You got an untimed record by this nurse who, you know, I don't, doing this a long time, I had never seen an untimed phone, untimed records. But here's what You mean usually the records will have a time stamp on it. Exactly. And you're right. This is not my fault that this record's kind of cockamamie. Right. But anyway, but what we do know, sometimes you got to look at what happened and what's there, not what this lady said. Fleming said she don't remember a thing. Whidbey says she don't remember a thing. Whidbey doesn't have a single thing. Whidbey remembers lots of things, but they seem to be different every time she's asked But what we do know, Judge Corns, is that there's two phone calls. There's a 955 phone call, and there's a 312 phone call. We do know that at 244, Whidbey says that she ordered the records from Rockdale Medical, where Mr. Collardo had previously been treated. She ordered the records there because she learned that he had ITP. Well, those records were to be able to assess patients, let alone diagnose them. Wait a minute. The hospital records weren't ordered in 9... No, no. They were ordered at 244. Right. You said 9... Which is in between the first and second phone call. And the reason they were ordered was, according to Whidbey, because Whidbey ascertained that she had ITP. So how does Fleming know to order to get the records at 244 if she doesn't know at 955? Well, they're arguing, they're saying there's a possibility that the fax machine is daylight. Everything works out their way if the fax machine was off by an hour. Sure, and I fell off a turnip truck yesterday. But I mean, it's kind of like, if that were true, Judge, don't you think they would have had 16 affidavits from the machine? It's their machine, it's their fax, and Fleming testifies under oath that those records were sent at 244. Whidbey, I mean, Fleming also testified that she sent them to the lab for blood work between 245 and 3. So again, that's before 312. The one record that she does time is 3 o'clock, where she takes the vital signs, which again was in that order. She never applied the pressure treatments. There was four things... And it was timed and that there was some stamped time on the note? No, she wrote it. That was the only thing she timed. And of course, they say the vital signs are normal. The man's pulse was 10. I mean, I don't know what the heck this lady did. I mean, if his pulse was 10, he'd kind of be dead long before... Well, they're going to argue, and I guess are arguing, that given this record, it's just as reasonable to infer that Nurse Fleming only found out about the ITP, if I said that right, when his last visit to her, when he comes in around 245. That's when she finds Whitby. That's when they swing into action. Oh, they swing into action? Tell me why that is not the reasonable inference from this evidence. Well, yeah, we're at summary judgment, Judge. We're not here to decide the case. I agree with that. We're here on reasonable inferences. All right, let's assume that's a reasonable inference. And that's what their expert comes up with. I don't know how Judge Cohn comes up at 510 when even their own expert concedes 312. All right, 312, they can't get the blood. Fleming testifies that they would know within a matter of minutes. We still got a two-hour delay. They don't take them. I mean, there's no reason, even given those facts, I'm saying there's an eight-hour and ten-minute delay, which is ridiculous. But even under their facts, there's a two-hour delay, which under the cases in this circuit, like Aldridge against Montgomery, is way too late. But here, what you also got is they had to do one task to draw blood, one essential task, which was routinely conducted under those circumstances. And they didn't even do that. That's deliberate indifference. Is that your argument below, that they waited too long? I thought they called the ER. It sounded like it took a long time for the ambulance to get there, but I thought they pretty promptly called it. No, no, no, no, Judge. There was no ambulance. We'd be testified that the policy of the jail was in the policy of correct health. And I think they're interchangeable, and there's a nondelegable duty to assign. You know, they're both. The policy's one and the same. But she said she had no authority to call an ambulance. So at 3 o'clock, if they know he's got ITP, and at 3 o'clock, if they know that they can't get the blood work, which is the only test they're supposed to do under those circumstances, and they don't do it, they need to get him to the hospital ASAP. But what do they do? They do nothing but over two hours. What are they waiting on? Just somebody from the jail to transport him? Yeah, they transport him at 534. And while the time's ticking, we've got evidence from a reputable hematologist. He used to work at the Professor at Duke. He was at Charleston, and he testified that time was of the essence. And like in all the delay cases like Goldberg, the issue is in the delay, the seriousness of the medical need here, the medical need was pretty serious. The man was going to die if he didn't get treatment. And then the other thing you have is the reason for the delay. There's no reason for the delay. You know, that LPN, you know, she's got a myriad of other jobs to do. So the evidence is at 1137, he's still bleeding, and she sends him to booking, and she's missing in action for over two hours. I asked her what she did in those two hours.  And the testimony from Correct Health's expert was that they're overwhelmed with paperwork, they've got to push pills, they've got to do all kinds of stuff. And she's the only one there, and this man's dying, and they're doing nothing. You know, what puzzles me is even when he lands at the hospital finally at about 534, even the hospital doesn't think that it's an emergency, does it? It waits until 630 before it even draws blood. Well, they don't send him by ambulance. They take him by patrol car. I got taken to the hospital the other day by ambulance, so somebody showed up. But if you don't get taken by ambulance and he's... When you've got thrombocytopenia, it's kind of like when you have a backache. I mean, you know, nobody, or spine problem, nobody can see it. Can't see that the man's got thrombocytopenia. Right, well, that's the problem. I mean, this isn't like a broken leg or a head concussion. Well, it's not the problem when they know he's bleeding. He's bleeding for hours. I mean, he's been bleeding on and off for five days, and they've got no records. He's taken to the jail numerous times. Well, but, you know, I'm interested. Nurse Ayers says patient reported that at the time he had a nosebleed on and off for the past five days, but did not report it to anyone in medical. Well, that's not true, Judge. I mean, that's what you do when you want to cover up a misdeed. The evidence is that he had bleeding on the 8th. He had bleeding on the 11th. He was taken to medical on the 12th and the 13th, and a deputy testified that he was told that he was bleeding from the rectum the night before. So, I mean, the fact that he never told anybody, and there's a note at 250 which says that the nurse told him that if he had a nosebleed, to go tell somebody. So at 250, he calls again. He's in booking, and they say he has a nosebleed, and that's when they call Fleming for the third time. There's no evidence. She makes the call at 312. I think what happened, in my opinion, and I think there's a reasonable inference. Again, we're talking about summary judgment. We're not talking about a jury trial. I mean, all the facts are supposed to be on my side of the case, and all the inferences are supposed to be in our favor. Proceed with your thought, though. I want to hear what you're going to say. What happened, do you think, at 312? Well, I think what happened at 312 is, number one, they knew. Number one, they couldn't get the blood, and they did it around for an extra two hours, but I think they knew at 955, because if they didn't know at 955, they wouldn't be faxing records at 244. They wouldn't be taking his blood at 3 o'clock. I think she was so burdened with so many tasks that she didn't get around with it, and when at 250, she found out about the nosebleed, said, whoopsie, I better go do this stuff. And then she calls Whitby, who's, you know, the doctor's a self-described zombie who's in another jail. Whitby's in Jefferson, Georgia, which is an island. All right, that's beside the point. Let's keep on our track here. I'm sorry, I get it. It's hard. I was dropped when I was a child, so I kind of get off a little bit. I want to ask you about the call that Mr. Collardo made to his daughter on the day he died. Yes. And at that point, he told her that he had been bleeding profusely, that he told the medical staff he had a blood disorder and that they weren't going to treat him. Right. I didn't see that really in the mix of the evidence considered by the district court. Is there a reason? I have no idea. I mean, is there an evidentiary reason? No, I mean, there's a lot of things that I still don't understand how the district court, as a smart man, how he bought hook, lock, and sinker. Like Judge Martin said, I noticed that too, but the problem here is I don't know that this was something that was part of the evidence or you called his attention. My guess was that there was some concern on your part, this was hearsay, so it wasn't admissible. It wasn't even in your briefs. Right, well, I mean, my point was that I always look at these medical things. I try to just do them from the defendant's standpoint because, you know, I figure most courts kind of discount what the plaintiff says. But I think the record is so clear that there was deliberate indifference. I mean, we got a serious medical need. The guy's got thrombocytopenia. You've got these folks aware of it. They've connected the dots and they've inferred that that's what the deal is because she's ordering this stuff and she knows both of them, even Fleming. I missed that in my brief, too, but I looked back when I was preparing. On page 7, even though she claimed I mean, the lady's, she's clever in these deliberate indifference cases. The less you know, the better off you are. But she does say on page 7 that she understands that if you've got thrombocytopenia that you can get an internal bleed and Whitby says that, too. So they understand it's a serious thing. Even Whitby's nurse practitioner, Judge Cone was quick to mention that she's got a doctorate. Well, but I mean, so she knows what the consequences are and that's why she gets busy and she starts ordering blood work stat. So she's already connected the dots and they've delayed, they've delayed the delay. I mean, so it's a jury question for a jury to decide whether or not they were deliberately indifferent or not. All right, Mr. Butt, you've saved some time for rebuttal and we'll let you have that. Thank you very much, Judge. Thank you. Good morning. I was actually here on Wednesday and heard Judge Martin say that she heard never to drink the water at counsel tables. I'm assuming the risk here by taking a sip. I really, I want you to know that our courtroom deputy takes good care of that water. We're not deliberately indifferent because Judge Martin did warn everyone. Poisoned at the 11th circuit. Good morning and may it please the court. My name is Allison Curry. I'm here on behalf of the Appleys, Deirdre Fleming, and Deborah Whitby. My clients have two issues before the court today. One is that this court should affirm Judge Cohen's grant of summary judgment to Nurse Fleming and Nurse Whitby because even taking the facts and inferences as appellant alleges them, neither nurse was deliberately indifferent as a matter of law. And second, this court should refuse to find that Judge Cohen abused his discretion in failing to consider supplemental jurisdiction for the appellant's state law claims because he never had the opportunity to use his discretion since appellant never raised that issue below. You know, you cited the quality foods case. Yes, ma'am. And it's really an interesting case. I mean, in that case Judge Hill said even though the plaintiffs didn't call the statute of limitation problem to the district judge in connection with asking for a remand, the panel was compelled to remand to the district court for reconsideration of whether it wishes to exercise discretion to consider the appendant claims. Yes, Your Honor, but the court also remanded with something of an instruction that the district court didn't need to let supplemental jurisdiction or let the statute of repose be a guarantee of him exercising supplemental jurisdiction. I understand he has discretion, but Judge Hill, anyway, said the panel was compelled to remand to the district court. And yet, they also said that although this potential statute of limitations bar is a necessary consideration, it's not the only consideration. It's not the function of a federal court to rescue a party from the danger of limitation by permitting the litigation of inappropriate matters in federal court. In this scenario, the movement's briefing and summary judgment was completed in December 2016. The statute of repose ran in March 2017. Appellant filed seven response briefs to the movement's summary judgment motions, and across seven briefs, failed to mention the looming statute of repose three months later. When the statute of repose came and went in March, and Judge Cohen still hadn't issued an order, she failed to supplement her briefing and let Judge Cohen know about this issue. And when Judge Cohen issued his order granting summary judgment to the appellees in July of 2017, appellant failed to file a motion for reconsideration or a motion for relief from judgment. But you don't, you're not telling us we can't send it back to him for that reason. I mean, I think we have authority to send it back to him and let him consider that, don't we? Your Honor, my client's position is that you shouldn't because... But you're not saying we can't. I'm not saying that you can't. This Court has wide discretion to do whatever this Court decides to do. However, this Court shouldn't do that because the appellant had the three opportunities I just laid out to raise this to Judge Cohen and failed to do so. The Edwards v. Okaloosa case on which appellant heavily relies on her briefs involved an appellant who had filed a motion for relief from judgment to the district court after he denied supplemental jurisdiction. And in that case, the district court judge considered the motion, agreed that the statute of limitations was a bar to her claims, declined supplemental jurisdiction anyway, and did so without considering any of these Gibbs factors. And at that point, appellant's claim was ripe to be heard by this Court. Appellant here has skipped that step. She skipped the step of getting a ruling from Judge Cohen to appeal on, and now she is asking this Court to find that Judge Cohen abused his discretion when he never had the opportunity to use any discretion. Well, okay. I understand your argument. I'm not terribly persuaded by that. I think concentrate on the main thing, if you will. I want to know why, in fact, it was not aired a grand summary judgment on the merits. Of course, Your Honor. Appellant, in her argument and the counsel's argument today and in her briefs, tends to conflate the actions of Nurse Fleming and Nurse Whidbey. But deliberate indifference can't be based on collective or imputed knowledge. Each individual actor has to be judged on what she knew and what she did. So here's what Nurse Fleming did, even under appellant's version of the facts. She treated a walking, talking, conscious patient in no distress three times in six hours. She applied ointment... The key, I think, to this is when the ITP, when they knew about that. If they never knew about it, then we may have some issues with the ambulance and delay, but their protocol seems to be appropriate. When they know about it, though, I believe that you agree your position is that's when you mobilize, when you know somebody's bleeding and you know they've got this autoimmune. So, did they know about it? And Nurse Whidbey says she did know about it. Now, she was never at the jail, so somebody had to tell Nurse Whidbey. And she also says that knowing about it prompted her to take some of these steps, like drawing blood. So that means it can't be Nurse Ayers, now Nurse Cook, who told her he was on the way to the emergency room. It had to have been Nurse Fleming. So when did Nurse Fleming tell her about the ITP? Your Honor, it doesn't matter, because even if Nurse Fleming knew about ITP as early as 9.55 in the morning, knowing that Mr. Collardo had a condition called ITP still doesn't give her the subjective knowledge necessary to draw the actual inference that Farmer v. Brennan requires of a state actor to have before they can be deliberately indifferent. Even if Nurse Fleming knew about the ITP, she testified she'd never treated a patient with ITP. She said the words, I'm unfamiliar with ITP. She didn't know if a nosebleed could be a symptom of ITP. She was also confronted with a patient who was objectively presenting as in no distress. He was talking. He was conscious. All of the evidence in the record corroborates that the deputies who transported him back and forth from medical weren't observing him. So you're saying if she knew about ITP first thing in the morning and didn't tell, she's not deliberately indifferent. Absolutely. At some point, though, she does tell. If she told in the afternoon and Nurse Whidbey swings into action, then you're saying she acted promptly at that point. Is that what you're arguing? Yes, Your Honor. Under Appellant's version of the timeline, here's what Nurse Whidbey did. She received a phone call about a patient. But you agree with that. What if, though, she told Nurse Whidbey about the ITP in the morning? She heard about it. She tells, and Nurse Whidbey says, do all these things and she waits hours. Is she not deliberately indifferent at that point? No, Your Honor, because not all delay is unconstitutional delay. When you're a nurse that says, I don't know about ITP. I'm not a licensed nurse. The nurse practitioner tells you to do something and you wait seven hours. You're saying, once again, because it sounds like she's not real competent, that she didn't know what it meant, so she just didn't do anything? Incompetent medical care isn't deliberate indifference. Let me ask you this. What if day one, this is hypothetical, I know these are not the facts of this case, Mr. Collardo had told Nurse Fleming, look, I've got this bleeding condition. She doesn't know what it is. She's never been exposed to it. Under your argument, this could have gone on the whole time he was there. Right? No, Your Honor, because it's not that a nurse doesn't have a duty to escalate the care to someone else if they don't know what to do, but even under Appellant's timeline, Nurse Fleming, when she didn't know what this was, called a nurse practitioner and informed her of the situation. What Appellants criticize Nurse Fleming for is delaying and implementing a provider's orders, and that's only true, of course, under their version of the timeline. But even taking their version of the timeline, Nurse Fleming, Nurse Fleming's delay, her alleged delay, is only deliberate indifference if that delay was perpetrated with an actual inference that that delay could cause a substantial risk of serious harm to Mr. Collardo, and her subjective lack of knowledge of the condition of ITP, combined with her objective observations of Mr. Collardo as a specialist, make it reasonable that she didn't draw the inference that any delay in getting lab work performed was going to cause a substantial risk of harm to Mr. Collardo. This is distinct from the cases where there is a refusal or complete denial of care. This is distinct from cases where an unconscious patient is gasping for air and begging for help and begging to go to the hospital. Nurse Fleming, like the nurse in this Court's decision and Carus V. Williams, treated the symptoms of which she was aware in a patient that was in front of her. She escalated the care to a nurse practitioner. She attempted to follow the nurse practitioner's orders and when she was unable to, when the medical assistant was unable to draw blood, she called the provider back, received orders for him to go to the emergency room where he went, and to Judge Gilman's point, when he arrived at Rockdale Medical Center, he was reporting zero pain, he was walking, talking, and in no visible distress. Unless the Court has additional questions. Just one question. Are you aware of a case called Kingsley v. Hendrickson, a U.S. Supreme Court case from 2015? I don't believe so. That wasn't in our briefs, Your Honor. I didn't see it in either party's briefs. It's a case where the Supreme Court held that under the 14th Amendment an excessive force claim need only meet the objective component by showing that the force used against him was objectively unreasonable. And now there seems to be a split of authority among the circuits of whether that objective standard does away with the subjective standard in a case like this where it's deliberate indifference for serious medical needs. I don't know of any court yet that's passed directly on that, but there's some courts that have questioned whether this case of Kingsley is now going to change the farmer standard. Your Honor, I'm understanding is that the Eleventh Circuit has reconciled that point into the idea that risk can be inferred from its obviousness, but this isn't a case where Mr. Collardo's risk was on its face obvious. Even the deputies who testified have been unanimous in saying that Mr. Collardo was in no active distress. There was nothing to give Nurse Fleming the information either from her objective observations of Mr. Collardo or her subjective knowledge of ITP if she knew about it even first thing in the morning that would cause her to infer that he was at a substantial risk of serious harm by her actions. So it may be a malpractice case. Your Honor, there may be a jury question on negligence, and that's something that isn't before the Court today. Judge Cohen declined to rule on that issue, but Judge Cohen found, and we agree we believe correctly, that neither of these nurses as a matter of law were negligent of the facts where we take appellant's facts and draw the inferences she asks us to draw. If there are no further questions, we would ask that this Court affirm Judge Cohen's order in its entirety. Thank you. Thank you. Good morning. I'm Jason Waymire, and I represent the Rockdale County Defendants. On appeal here, the plaintiff has gone after is Rockdale County, and the plaintiffs have waived any appeal as to my other clients who are Sheriff Leavitt, former Sheriff Wigington, Captain Eaton, and Lieutenant Bogarts. So I'm only going to talk about the county unless the Court asks me questions otherwise. As to the county, the plaintiff's only theory is that the Sheriff's Office conducted an investigation that the plaintiff thinks was inappropriate. That's the only basis for their claim against the county. So I have several things to say about that. Number one, it was not raised in the complaint, and Judge Cohen below said, I'm not going to review that theory because it wasn't raised in the complaint. That's a well-settled legal doctrine. The plaintiff cannot amend their complaint in a response to summary judgment, and so that's what Judge Cohen did here. That's not an abuse of discretion. He was well within his discretion to do that, and that ground alone is a valid ground to affirm. If you reach the merits as to the county, this quote, sham investigation theory just doesn't hold any water. Number one, it was done by the Sheriff's Office, not the county. The county did not control the investigation, and even if it did, the investigation was appropriate and we can't ground liability. Generally speaking, whatever happens in an investigation after an incident didn't cause the incident to happen. There's no way that could ever be the case. I take it you represent Rockdale County regularly, or you do this type of work. In your view, what legal obligation does the county have to oversee the medical care received by prisoners in your custody? In Georgia, the way that this, well, I'll just say that in this particular case, the way that the county is related to inmate medical care is that it typically approves a contract. The sheriff by law is entitled to pick a contractor, and the county can't really say who the contractor should be. It can't really reject that contractor. That's Georgia's... I won't say none, but I'm trying to draw out that the county is only related to inmate medical care as a matter of law by passing the sheriff's office budget and then paying the bills. That's just the way the law works and the way this situation worked. So... Or didn't, as the case may be. Didn't work. Well, Mr. Clardo got, in some sense, medical care, and the county didn't really oversee that, couldn't oversee that. The county doesn't tell the medical provider how to provide medical care, and you don't want counties telling the medical provider how to provide medical care. I mean, the medical provider is hired because they are presumably competent to provide medical care and make medical decisions that law enforcement officers and county officials aren't competent to do. So... I hope I've answered that adequately. But, basically, I would follow up and say it's not fair to hold a county liable for things that it doesn't control and legally can't control. I mean, really, it just pays the bills here. That is the relationship of the county to inmate medical care. I think fundamentally this case is a medical malpractice case. It doesn't have anything to do with a county policy. The plaintiff hasn't pointed out a county policy that caused anything to happen here. And so, under Monell, if you want to reach the merits of Monell, there's no county policy, there's no... So you're okay with us sending it back to Judge Cohen to decide the state medical malpractice claims? All I'm asking you to do is affirm the summary judgment as to Rockdale County and Sheriff Leavitt, Sheriff Wigington, Captain Eaton, and Lieutenant Bogarts. I don't represent anybody else. So, yes, I guess the answer is yes to that. If the court has no questions for me, then I will sit down. Thank you. Mr. Waymore, I said it right. He got in some sense medical care. Got zero medical care that day. And she says there was nothing wrong with the guy. They changed him out of three jumpsuits. He was bleeding the whole time. Here's the question they're saying. Even spotting you that Nurse Fleming knew in the morning, he told her he had ITP. She tells Whitby. Whitby tells her do the blood work, order the hospital records, whatever. And they're saying even with that, which is a pretty good fact for you if that's the inference, they're saying even with that Nurse Fleming's delay was malpractice, it was negligent, but it doesn't cross the line to being deliberate and different because she wasn't real savvy on medical matters and she didn't know how serious ITP was. What do you say to that argument? I don't think it's a very good argument. I know you don't, but tell me why it's not good. I'll tell you why that argument's no good. Because once she says she knows what the consequences of ITP are on page 7 of her deposition. She does? Yes, she does. She says that she knows that it could cause an internal bleed. So she knows how significant it is. That's at the time of the deposition. Does that mean it relates back to what she knew on the day of this time on March 15? Well, I assume that she knew it on March 15. She didn't say she didn't know it on March 15. I asked her at the deposition if she knew that thrombocytopenia could cause an internal bleed. She said yes. I mean, it's right there on page 7. So she knew. Whitby says she knew, but she also said she knew that with ITP she needed to call the provider. And she did. And what does the provider do? The provider says she's got to do the blood work stat. Stat means immediately. And that's the only thing. And everybody admits that that's the standard of care. That's what you're supposed to do. She doesn't do that. And she doesn't do the one test she's supposed to do. Whitby doesn't do the one test she's supposed to do. That's deliberate indifference in and of itself, but all the cases... What test was Whitby supposed to do? Supposed to get a blood test. That's all. I mean, that's pretty simple. And they didn't do it. Plus, they waited 8 hours and 10 minutes to get him to a hospital. And, you know, and this guy was a ticking time bomb. The cases are that if it's a delay case, and if we got medical evidence verifying it, which we did, that the delay worsened. That's one of the issues in deliberate indifference in a delay case. Do you have any evidence in the record, though, that shows that he was in fact in pain? Well, he was calling... Or that his vital signs were not okay? It's like Judge Martin said in the deposition. He thought he was going to die there. But his vital signs, she said, was 10. But what the pain was, the guy was bleeding out of 3 jumpsuits. That's pretty noticeable. I mean, the Aldridge case, the guy had needed 6 stitches, and there was blood there. And this Court said that the 2 1⁄2 hour delay was deliberate indifference. In Boerum against Ozem, a 14 minute delay was deliberate indifference. They knew this guy was in trouble. He was bleeding. At 1130... But it wasn't like blood was pouring out, now, was it? Well, I mean, you change somebody out of 3 blood... out of 3 jumpsuits, and I think what's deliberate indifference in and of itself, at 1137 she sends him to booking where he's not getting any medical monitoring, and she says he's still bleeding. At 1137, he gets there at 924. She doesn't take... I mean, you know, he'd been bleeding from his rectum the night before. He'd been bleeding on and off for 5 days. He'd been to the medical unit 4 times, and there's no record of any of this stuff, which I'd like. I only have a minute 18 left. Is it all right if I talk a little bit about the county? Did I answer your question, sir? Yeah. First of all, with regard to the sham investigation being a new claim, that's not true. If you look at paragraphs 278 to 305 of our complaint, we do set forth a policy. Basically, the policy is that this place does medicine on the cheap. They substitute LPN for doctors, and that's what you get. They admit this LPN is a chucklehead. She doesn't know a whole lot about anything. I mean, that's who they got there. They don't have a doctor there. They don't have a nurse practitioner there. You know, they want to talk out of both sides of their mouth once they say she don't know nothing. But anyway, White v. Beltram, Judge Martin wrote the opinion 789 5 3rd 1188, where there was an allegation, like there is in this case, that there was a substandard medicine. If you look at our thing, we talk about systematic deficiencies and the fact that they had people. You know, the evidence also is that that Lemon lady, she didn't know what anything was when she did the intake. You know, the records are untimed. You know, they go five times to the medical unit and nobody takes a record. I mean, you got a guy bleeding for five days and there's no record of it, and this guy's got a blood disorder. I mean, come on. That's not constitutional. They're systematic deficiencies. We listed them. Cite the case of Thomas v. Town of Davie, 847 F 2nd 771 773. 1988 case from the circuit which talks about policies of deficiencies in staffing or procedures such that the pretrial detainee is effectively denied access to adequate medical care. That's deliberate indifference. Briefly on this sham investigation. Your time is up, so if you can be winding it up, that would be great. All right. Can I do just real quick? Real quick. We think that the post- incident evidence is very important evidence. What it shows is it's not an allegation. It's a sham investigation. What they did was they took a bunch of statements about bleeding. It was really a cover-up to try to get a defense, but it's not a mortality review. It was a sham, but what it shows is it shows what the policy that existed on the day of this incident. Because had that been an arm of the county, I know Judge Martin and her dissent in Lake v. Skelton kind of thing. You're getting chatty in your overtime here. I'm sorry. I think that's critical and impactful evidence that the sheriff in the county knew how bad the policies were and how substandard it was because otherwise they would have taken discipline. Otherwise they would have done a real investigation instead of concealment and a cover-up. It's sad. This case, at the very least, should be remanded on the statute, but it's much more than a medical malpractice case. It also evinces how egregious counties can be when they just ignore medical care. This man was a human being and he deserved medical treatment. Thank you so much for your indulgence and your time. Thank you. That concludes our court for the week, so we are in recess. Thank you.